IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

Masu Fahnbulleh,                          )
                                          )
                    Plaintiff,            )    Civil Action No. 2:12-00009-RMG-BHH
                                          )
        vs.                               )
                                          )    **REPORT AND RECOMMENDATION**
                                          )    **OF MAGISTRATE JUDGE**
                                          )
Force Protection Industries, Inc.,        )
                                          )
                    Defendant.            )
_____ )

This matter is before the Court on the defendant's motion for summary judgment [Doc. 22] pursuant to Federal Rule of Civil Procedure 56.  The plaintiff brought this case alleging employment discrimination based upon his race (African-American) and national origin (African), claiming conspiracy to terminate, hostile work environment, harassment, wrongful discharge, and retaliation, pursuant to 42 U.S.C. § 1981 ("Section 1981").

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

## FACTUAL BACKGROUND

The defendant hired the plaintiff, an African-American male, as a Logistics Specialist effective January 14, 2008. (Pl. Dep. at 20-21; Ex. 2.)  It is undisputed that the defendant manufactures blast-resistant vehicles for use by various branches of the military. During the plaintiff's employment, the defendant had manufacturing sites in Ladson and Deming Way, South Carolina, and Roxboro, North Carolina., where it produced mine-resistant, ambush-protected ("MRAP") vehicles such as the Buffalo, a mine-clearing truck, and the Cougar and Cheetah, used for transportation. The defendant hired employees in all aspects of production, from facilitating the MRAP orders to assembling the MRAP vehicles, as well

as instructors to train military personnel on driving and up keep of the blast-protected vehicles.

As a Logistics Specialist, the plaintifff handled customer requisitions for spare parts and coordinated customer purchases. (Pl. Dep., Ex. 5.) On April 23, 2008, the plaintiff applied for the position of Spares Account Representative, which he received on July 23, 2008.  (Pl. Dep. 25-27; Pl. Dep., Exs. 5, 7.) As a Spares Account Representative, the plaintiff was responsible for specific external customer accounts. (Pl. Dep. at 26-27.)

At the same time tht the plaintiff's application for the Spares Account Representative position was pending, he also applied to become a Staff Instructor II.  (Pl. Dep., Exs. 5-7.) A Staff Instructor II is responsible for lecturing and training military personnel on the operation and maintenance of the Company's MRAP vehicles.

Although the plaintiff interviewed for the position on two occasions, Kenneth Turner, the Senior Instructor/Training Manager who supervised and hired the Staff Instructors IIs, concluded that, while the plaintiff was an "experienced instructor" and "eager to learn," he lacked the requisite "mechanical skills." (Parson Stmt., Ex. 2.)

The plaintiff had previously instructed soldiers on deployment and hazardous materials during his military service from 1988 to 1996. (Pl. Dep. at 30.)  The plaintiff believed that this experience included the commensurate mechanical skills needed for the Staff Instructor II position.

The plaintiff was not offered the position but was recommended, by Turner, for the position of Staff Instructor I, and told that he could "train and work" his way up to Staff Instructor II. (Pl. Dep. at 41; 51; Pl. Dep., Ex. 12.)   Unhappy with the decision, the plaintiff contacted Stacey Parson, in human resources, asserting that he was qualified for the Staff Instructor II position.  (Pl. Dep., Ex. 12; Pl. Dep. at 41-42.)

The plaintiff started the Staff Instructor I position, on September 29, 2008.  That same day he emailed Parson again asking for reconsideration of the Staff Instructor II position,

as a result of additional training he had received in the interim. (Pl. Dep., Ex. 16.) After approximately two more weeks of training, Turner and two other Senior Instructors, Josh Campbell and David Gillepsie, agreed that the plaintiff should be reconsidered for the Staff Instructor II position. Thereafter, the plaintiff became a Staff Instructor II, effective January 8, 2009. (Pl. Dep. at 102; Pl. Dep., Ex. 21.) As a result, the plaintiff deployed to Iraq, on March 4, 2009. (Pl. Dep. at 103; Pl. Dep., Ex. 26.)

Prior to leaving, the plaintiff was accused by a co-worker, John Wilson, of moving a camera. When the plaintiff acknowledged that he moved the camera, Wilson told him not to touch the equipment because he was "a foreigner" and that "whoever brought you here needs to hurry up and get you out of here." (Pl. Dep., Ex. 22; Pl. Dep. at 105-06.) The plaintiff complained of the incident. Wilson was made to apologize and the defendant instituted diversity training. (Pl. Dep. at 116-17; Pl. Dep., Ex. 23.)

As will be discussed more fully, *infra*, the plaintiff was only in Iraq a little over a month. In that short time, the plaintiff was transferred on two occasions to different locations. Eventually, he was accused both of sexual harassment against a civilian employee employed by the Department of Defense and an assault against a co-worker. The plaintiff was sent back to South Carolina, pending investigation. (Pl. Dep. at 157.) After an investigation and a refusal by the civilian employee to cooperate, the investigation against the plaintiff was closed. (Pl. Dep., Ex. 22.) The plaintiff, however, was never redeployed to Iraq. The defendant contends that, for its own open investigation, the Department of Defense would not allow it. (Pl. Dep., Ex. 28.)

Subsequently, the plaintiff was transferred to the defendant's Roxboro, North Carolina facility. The plaintiff alleges that he continued to be mistreated there as well. The Court will describe the allegations in greater detail below, but the plaintiff generally complains that (1) he was not permitted to teach certain classes because individuals were

3

complaining about him; (2) other instructors harassed one of the students in his class; and (3) he was suspended for confronting those instructors.

In September 2009, the defendant informed the plaintiff that his job was being terminated as part of a company-wide Reduction in Force ("RIF"). (Hearn Stmt. ¶ 21.) The plaintiff was given an opportunity to apply for an open Spares Account Representative position. (Pl. Dep. at 25-27; Pl. Dep., Exs. 6 & 7.) The plaintiff, however, was not selected for the position.

Thereafter, the plaintiff's employment was terminated, on November 17, 2009. The defendant contends that he was fired as part of a company-wide Reduction in Force ("RIF"). The plaintiff contends that his employment was terminated on account of his race and national origin and in retaliation for his having complained about John Wilson's comment.

## **APPLICABLE LAW**

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law.  As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant.  *Id.* at 257.  In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion.  *Anderson*, 477 U.S. at 252.  Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion.  *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  *Anderson*, 477 U.S. at 248.

## DISCUSSION

As an initial matter, there are some serious evidentiary obstacles in resolving this case.  First, the plaintiff apparently conducted no discovery.  He did not propound any written interrogatories or request for production nor did he take any depositions.  Instead, he relies almost exclusively on his personal and sworn affidavit, which in various respects attempts to attest to facts almost certainly not within the plaintiff's personal knowledge.  The defendant would have the Court strike the whole testimony.  The Court seldom accepts

5

such an invitation and will be careful to rely on only those portions of the affidavit that appear to be reasonably within the plaintiff's estimation.

But, the defendant itself has relied heavily on certain unsworn "Witness Statements," most notably that of an April Hearn, in justification of its motion. [Docs. 22-5, -6, -7.] Two of the statements preamble that the witness was "duly sworn," but there is no witness signature, attestation, or other notarization. *Id.* The Hearn statement, which is most central to the defendant's case, contains no such language and is not otherwise sworn.

The plaintiff has not produced competing evidence to refute the unsworn statement of Hearn; indeed, the plaintiff himself, relies on exhibits to these unsworn statements in his own response (see, e.g., Pl. Resp. at 2-3). But, the plaintiff categorically denies that he has ever had any contact with an April Hearn or that he was ever aware of her participation in any the events at issue in this case. (Pl. Aff. ¶¶ 76-77.)

Hearn's statement was neither sworn under oath nor made under the penalty of perjury. It barely professes personal knowledge of the facts contained. As a result, the statement fails to meet the most basic requirement of form required by Rule 56. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 n.17 (1970) (noting that unsworn statement in support of motion for summary judgment did not meet the requirements of Fed. R. Civ. P. 56(e)); *In re French*, 499 F.3d 345 (4th Cir. 2007); *see also* 28 U.S.C. § 1746 (setting forth requirements for declarations and affidavits submitted to the court). Although seemingly well established, the Court may be misperceiving some exception to this typical requirement.

Additionally, the technical deficiency in the statements affects the reliability of the exhibits attached thereto. "It is well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment." *Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir.1993). Rather, "[t]o be admissible, documents must be authenticated [ ] by and attached to an affidavit ... and the affiant must be a person through whom the exhibits could be admitted into evidence." *Hamilton v. Mayor & City Council of Baltimore*, 807 F. Supp.

6

2d 331, 352 (D. Md. 2011) (citations omitted).  In other words, the defendant's presentation of unsworn statements raises additional doubts about the Court's ability to rely on other relevant and critical documents.

One result is for the district court to conclude that the record is too procedurally immature to grant any judgment at this time.  Alternatively, the undersigned would analyze the claims of the parties and offer a substantive recommendation based on the evidence of record, over which the parties do not seem to dispute, to wit, attached documents to unsworn statements, bearing in mind, always, the standard of review that the plaintiff's evidence, to whatever extent established, deserves all favorable light.

The Court, therefore, will cite the defendant's unsworn statements and concomitant exhibits but will mostly not accept the witness statements, themselves, as competent to meet the defendant's burden on a particular disputed fact.  The Court will view more liberally, to wit, "effectively," the attached exhibits, however.

Lastly, the plaintiff's Complaint alleges a conspiracy to discriminate, discrimination, hostile work environment, and retaliation, pursuant to 42 U.S.C. § 1981. In particular, the plaintiff alleges: discrimination in promotion decisions, discrimination in deployment; discrimination in failure to re-hire him in Spares Accounts; harassment due to false accusations; harassment regarding assignment to Assistant Instructor in Roxboro; harassment because his co-workers did not want to work with him; retaliation for failure to re-deploy him to Iraq; retaliation by suspension; and retaliation by termination.

Not all of these causes are treated by the plaintiff in his response.  To the extent they are, the Court would address each in turn.

## I.    42 U.S.C. § 1981 Race and National Origin Discrimination (Failure to Promote) Claim

The plaintiff has first pled a cause of action for failure to promote.  In truth he has

pled a claim for *delay* in promotion because he was, in fact, promoted.  It is an acceptable basis for the claim – delay.[1]  *See Collum v. Brown*, 209 F.3d 1035, 1042 (7th Cir.2000); *see also Caldwell v. Johnson*, 289 F. App'x 579, 586 n. 7 (4th Cir.2008) (unpublished) (suggesting a delay in promotion could be actionable if there is "sufficient evidence . . . to link the purported delay to discrimination by [the plaintiff's] supervisors."). He complains, however, that he was discriminated against on account of his race and national origin insofar as the defendant did not initially select him for promotion to the Staff Instructor II position. The plaintiff alleges that the defendant rejected his application originally because he is black and African.

Initially, the Court would say that the defendant is right to argue that Section 1981 does not protect against discrimination based on national origin. *See Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987) (noting that Congress intended § 1981 "to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics," not based "solely on the place or nation of origin"); *see also Jenkins v. Gaylord Entm't Co.*, 840 F. Supp. 2d 873 (D. Md. 2012).  The District of South Carolina has recognized the exclusion of national origin claims under Section 1981 in *Vaca v. Sears Roebuck Co.*, CA No. 3:04-23423-CMC-BM (D.S.C. Dec. 12, 2007)(noting that "Section 1981 only provides a cause of action based on race" and that "claims of discrimination based on national origin are not within the scope of § 1981").  Because all of the plaintiff's claims are pursuant to Section 1981, they should all be dismissed to the extent they are based on discrimination, retaliation, or harassment on account of the plaintiff's national origin.

Regarding a claim for discrimination based on the plaintiff's race, the Court would recommend as follows.

---

[1]  Without evidence, the plaintiff represents that any delay cost him approximately $550.00 per day.  (Pl. Resp. at 27.)

The Fourth Circuit has explained that a plaintiff may avert the defendant's summary judgment motion and establish her failure to promote claim "through two avenues of proof." *Diamond v. Colonial Life & Acc. Ins. Co.*,  416 F.3d 310, 318 (4th Cir. 2005) (quoting *Hill v. Lockheed Martin Logistics Management, Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (emphasis added).   A plaintiff can survive a motion for summary judgment by presenting direct or circumstantial evidence that raises a genuine issue of material fact as to whether an impermissible factor such as race or gender motivated the employer's adverse employment decision. *Diamond*, 416 F.3d at 318.

Alternatively, a plaintiff may "proceed under [the McDonnell Douglas ] 'pretext' framework, under which the employee, after establishing a prima facie case of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination." *Hill*, 354 F.3d at 285. The plaintiff does not attempt to establish his discrimination claim using direct or circumstantial evidence but relies exclusively on the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) burden-shifting proof scheme.

Under *McDonnell Douglas*, an employee must first prove a *prima facie* case of discrimination by a preponderance of the evidence. If he succeeds, the employer has an opportunity to present a legitimate, nondiscriminatory reason for its employment action.  If the employer does so, the presumption of unlawful discrimination created by the *prima facie* case drops out of the picture, and the burden shifts back to the employee to show that the given reason was just a pretext for discrimination.  *See McDonnell Douglas*, 411 U.S. at 802-05.

These same proof mechanisms are available for Section 1981 claims, as pled here. *See  Lightner v. City of Wilmington*, 545 F.3d 260, 263 fn. * (4th Cir.2008)**.**

The plaintiff, however, has not claimed any direct evidence and only relies on *McDonnell Douglas.*

9

### A.    *Prima Facie* Case

To establish his *prima facie* case of a discriminatory failure to promote, the plaintiff must show: (1) that he is a member of a protected class; (2) that he applied for the position in question; (3) that he was qualified for that position; and (4) that the defendant rejected his application under circumstances that give rise to an inference of unlawful discrimination. *See Bryant v. Aiken Reg. Med. Ctrs., Inc.*, 333 F.3d 536, 544-45 (4th Cir. 2003); *Amirmokri v. Baltimore Gas & Elec. Co.*, 60 F.3d 1126, 1129 (4th Cir.1995).

The defendant mainly disputes that the plaintiff can establish the third element but also that the fourth element cannot be satisfied because it treated white and black applicants for the position comparably.

As to whether the plaintiff was qualified for the position, there is, of course, some disagreement. According to the Position Description, A Staff Instructor II is responsible for lecturing and training military personnel on the operation and maintenance of the Company's Mine Resistant Ambush Protected ("MRAP") vehicles. (Hearn Stmt., Ex. 2.) Critically, the job description states that Staff Instructor IIs will serve as "Subject Matter Experts on vehicles and systems." *Id.* Responsibilities for the position require experience in the "mechanical/electronic field of military tracked vehicles or heavy equipment" with a technical knowledge of the "first through fourth level of maintenance repair." *Id.*

The plaintiff believes he was qualified for the Staff Instructor II position because he instructed soldiers on deployment and hazardous materials during his military service from 1988 to 1996. (Pl. Dep. at 30.) The plaintiff's experience consisted of "work[ing] with maintenance [personnel]" as a Platoon Sergeant, in the 1990s, to oversee their work on the vehicles assigned to his platoon. (Pl. Dep. at 31.) The plaintiff has also submitted an affidavit, swearing that he had more than "8 years of U.S. Military Service working with heavy truck and wheeled vehicle through maintenance services along with technicians" gaining "knowledge and expertise on various components (example: air breaks system, diagnostic equipment, air conditioner systems, trnsmission and engine components.)" (Pl.

10

Aff. ¶¶ 3, 6.)  Importantly, he swears that he had specific knowledge of the MRAP vehicle based on his experience with comparable equipment, which featured "basically the same" engines.  *Id.* ¶ 6.

The defendant argues, however, that, at the time he was denied the promotion, the plaintiff had no direct mechanical experience, nor did he service vehicles as a Mechanic or Maintenance Technician, and, therefore, was not qualified. (Pl. Dep., Ex. 8 at 2-3; Pl. Dep. at 58.)

The plaintiff responds that the expectation that Staff Instructor IIs will serve as "Subject Matter Experts on vehicles and systems," is not an actual qualification of the position but rather a responsibility.  To that end, the plaintiff emphasizes that such language appears in the "Position Responsibilities" section of the job posting and not the "Position Requirements" section.  (Hearn Stmt., Ex. 2.)  The plaintiff offers no real legal authority for this kind of distinction.  The Court has not observed any.  What the applicant is expected to do seems fairly correlated to what the applicant is qualified to do.

That being said, for purposes of the *prima facie* case, the Court finds the matter essentially moot.  The defendant, in reply, effectively concedes the dispute, stating, "Fahnbulleh and three other individuals *all met the basic qualifications* to apply for the Staff Instructor II position. Ken Turner provided each the opportunity to interview." (Pl. Reply at 8 (emphasis added).)  The Court will take this admission as sufficient to satisfy the plaintiff's more minimal burden at the *prima facie* stage.  Moreover, the plaintiff offers the following email from Parsons, which essentially admits the same:  "Masu, your experience in the US army from 88-96 is what qualified you for the Instructor II position.  I understand that you did apply, qualified and interviewed for the Instructor II position, but the decision is the hiring managers (sic)."  (Parson Stmt., Ex. 4.) The real dispute over whether the defendant properly denied the promotion for a reasonable and non-discriminatory belief that the plaintiff was not more fully qualified will be delayed until a discussion of pretext, at the last stage of *McDonnell Douglas*, therefore.

11

Regarding the fourth element, the defendant attempts to characterize itself as actually treating the plaintiff more favorably than other white candidates. Kenneth Turner recommended one white applicant for the promotion, but rejected two white applicants and the plaintiff. (Parson Stmt., Ex. 3.)   As he did with the plaintiff, Turner interviewed Jack Frost (white) twice, and rejected him for the position finding he had "little to no mechanical background" and "no experience as an instructor." (Parson St., Ex. 3 at 4.)  Although Frost met the minimum qualifications to be interviewed, like the plaintiff, Turner decided he was not qualified and did not hire him. *Id.* But, the defendant emphasizes that Frost was not subsequently offered a Staff Instructor I position but that the plaintiff was.  But, that the plaintiff, in a sense, might have been treated differently than another rejected applicant is not an effective shield.  The Fourth Circuit has stated that to satisfy the fourth prong the plaintiff "need only show that the position was filled by a white applicant, as he has done." *Carter v. Ball*, 33 F.3d 450, 458 (4th Cir. 1994); *see also Blue v. United States Dep't of the Army*, 914 F.2d 525, 537 (4thCir.1990).  It is undisputed that the Staff instructor II position was given to Edward Wilson, a white male.  (Parson Stmt., Ex. 3 at 3.)   The element is satisfied.

### B.    Legitimate Non-Discriminatory Reason

The defendant has met its burden to produce a legitimate, non-discriminatory reason for rejecting the plaintiff's application insofar as the defendant believed that the plaintiff had insufficient mechanical experience, with the MRAP vehicle particularly.  (Pl. Dep. Ex. 8 at 2-3; Pl. Dep. at 58.)

"Job performance and relative employee qualifications [are] widely recognized as valid, non-discriminatory bas[i]s for any adverse employment decision."   *Evans v. Technologies Applications & Service Co.*, 80 F.3d 954, 960 (4th Cir. 1996); *see also Mackey v. Shalala*, 360 F.3d 463, 468 (4th Cir. 2004); *Karpel v. Inova Health System Services*, 134 F.3d 1222, 1229 (4th Cir. 1998).

12

**C.    Pretext**

Because the defendant has proffered a legitimate, non-discriminatory reason for its actions, the plaintiff bears the burden of demonstrating that the real reason for denial of the promotion was, in fact, an unlawful one.  *See Reeves*, 530 U.S. at 142-43.    As is most common, the plaintiff attempts to satisfy this burden by suggesting that the defendant's proffered reasons are pretextual or false.  *See id.* at 144.  Specifically, the plaintiff contends that the reason for his disqualification for the job must necessarily have been false because he was qualified and, further, that he was, in fact, recommended for promotion to the position within two weeks of his placement as a Staff Instructor I, by two Senior Instructors, Josh Campbell and David Gillespie.  (Pl. Dep. at 84, 86.)

As stated, the defendant did not believe the plaintiff had the requisite mechanical experience for the job.  The plaintiff baldly contends that he did.  But, the mantra is well worn that it "is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *Evans v. Technologies Applications & Service Co.*, 80 F.3d 954, 960-61 (4th Cir. 1996) (quotations omitted).  That the plaintiff perceived his military experience as commensurate with the mechanical responsibilities of the position, therefore, is not dispositive of pretext.

Instead, the plaintiff must produce evidence that the plaintiff *knew* he was qualified but rejected him anyway.  It is not the province of the Court to decide whether the reason for an employer's adverse employment action "was wise, fair, ***or even correct***, ultimately, so long as it truly was the reason for the [adverse employment action]."[2]    *See Dugan v. Albemarle County School Bd.*, 293 F.3d 716, 722 (4th Cir. 2002) (emphasis added).  The burden remains on the plaintiff, therefore, to demonstrate that the reasons offered by the

---

[2]    In *Dugan*, the plaintiff claimed that the defendant failed to properly apply a reduction-in-force policy.  The Fourth Circuit stated that "[e]ven if there is evidence that the school board erroneously or even purposely misapplied the RIF policy, it is not proof of unlawful discrimination." *Dugan*, 293 F.3d at 722.

13

defendant are not simply incorrect but rather "unworthy of credence *to the extent* that it will permit the trier of fact *to infer the ultimate fact* of intentional discrimination." *Id.* at 723 (emphasis added).

In a Seventh Circuit decision, the plaintiff was accused of theft. *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935 (7th Cir. 2003). The court stated that "it was up to [the plaintiff] to produce evidence showing that Wal-Mart ***did not genuinely believe*** that she had lifted the $12.65. It is not enough for her to show that the investigators might have made a mistake in their conclusion." *Id.* at 940 (citing *Pitasi v. Gartner Group, Inc.*, 184 F.3d 709, 718 (7th Cir.1999). So long as the defendant honestly believed that the plaintiff was not qualified, then his "claim cannot survive a motion for summary judgment." *See Adams*, 324 F.3d at 940.

Said differently, it is not enough for the plaintiff to prove that the defendant was wrong about his qualifications; he must show that the defendant *knew* it was wrong. His only evidence in this respect is that he was recommended for promotion within two weeks of having taken the Staff Instructor I position. There are two problems. First, the fact that the defendant so quickly realized the plaintiff's qualification is all to its credit and not its critique. Second, and more importantly, that recommendation has no tendency to show what the defendant knew at the time it rejected the plaintiff for the promotion. The subsequent reversal on the matter only reflects the knowledge or the belief as of that moment – when Campbell and Gillepsie recommended him as qualified. No reasonable jury could conclude that the defendant's later decision to promote the plaintiff meant that the defendant knew of his qualification but denied his promotion, in the first instance.

The plaintiff has not offered any other evidence as to the falsity of the defendant's explanation. He was actually promoted to the position, effective January 8, 2009. (Pl. Dep. at 102, Ex. 21.)

## II.    Failure to Re-Hire

The plaintiff also contends that he was discriminated against, presumably on

14

account of his race, when the defendant failed to re-hire him for the Spares Account Representative position. Relying on the unsworn affidavit of April Hearn, the defendant represents that it was going through a large reduction-in-force over the course of 2008 and 2009 due to the loss of business contracts. (Hearn Stmt. ¶ 18.) The defendant alleges that it notified approximately 45 employees in July 2008, 89 employees in September 2008, and 147 employees in December 2008 that their employment would be terminated pursuant to the reduction-in-force. (Hearn Stmt. ¶ 20.) In September 2009, the defendant states that it notified approximately 76 additional employees, including the plaintiff, that they would be terminated. (Hearn Stmt. ¶ 21.)

When the plaintiff was informed that his position would be eliminated, he applied for an open Spares Account Representative position in the Ladson facility, a position he had previously held. (Pl. Dep. at 25-27; Pl. Dep., Exs. 6 & 7.) Ninety-two applicants applied for the position, five of whom were current employees of the defendant. (Hearn Stmt. ¶24, Ex. 4; Payan Stmt. ¶8, Ex.1.) Of the five current employees, one was white and four were African-American. Like the plaintiff, it is represented that the other three employees had experience in the Spares Account area. (Hearn Stmt. ¶¶ 24-25.)

The same analytical frame work essentially applies, as above. The plaintiff can establish a *prima facie* case. The defendant admits his qualification – the plaintiff had previously held the position. And, it is undisputed that Connie Gugel, a white female, was hired for the position over him. (Payan Stmt. ¶¶10-12.)

But, the defendant has proffered, as a legitimate, non-discriminatory reason for the decision, that the hiring manager and decisionmaker, Ricardo Payan chose Gugel because he currently supervised her, and was, therefore, familiar with, her and her work. (Payan Stmt. ¶¶ 10-12.) Personal preferences in hiring have typically been upheld as a legitimate, non-discriminatory basis for employment decisions. *See Walker v. City of Oakland*, 57 F.3d 1079 (9th Cir. 1995) ("[W]hen faced with similarly qualified candidates, he tended to prefer

candidates who had been considered previously over candidates who were under consideration for the first time. The district court's determination that Walker was passed over for legitimate, nondiscriminatory reasons is not clearly erroneous.") It is a burden simply of production at this stage and, therefore, Payan's unsworn statement is not problematic in support of this point. *See Mereish v. Walker*, 359 F.3d 330, 335 (4th Cir. 2004) ("To meet his production burden under the McDonnell Douglas framework, Walker is not required to persuade us that the proffered reason was the actual motivation for Franz's decision. He must merely articulate a justification that is 'legally sufficient to justify a judgment' in his favor." (citations omitted)).

The plaintiff contends that, as evidence of pretext, he was required, as a part of the interview process for the Spares Account position, to do a Power Point presentation. (Pl. Aff. ¶ 71.) The plaintiff further attests that Stacy Parson, upon learning about it, stated that there was no such presentation requirement as part of the interview process and that he would speak to Payan about it. *Id.* Payan never gave the plaintiff the topic for the presentation and eventually hired Gugel without ever requiring one. *Id.*

The plaintiff's evidence suffers two deficiencies. First, the plaintiff does not offer any evidence that other white candidates were not told that they would have to do Power Point presentations or did not, in fact, do them. Second, the plaintiff was not actually required to do any Power Point presentation. This evidence, therefore, has no tendency to imply pretext.

The plaintiff has simply not raised any issues of fact as to the possible falsity of the defendant's proffered explanation such that a jury could find for him on a failure to re-hire claim.

## II.    Retaliation

As stated, the plaintiff pled numerous retaliation claims in his Complaint. (Compl. ¶¶ 43-53.) But, while he makes a summarizing reference to these claims (Pl. Brief at 21), he

16

makes essentially no argument related to any retaliation claim in his response brief. (Pl. Brief at 21-32.) He does not cite the framework for retaliation claims generally or otherwise inadvertently argue any of its elements. In one sentence, referring to the failure to rehire him, the plaintiff says that because the Power Point presentation was not a requirement of the Spares Account position, "[a]n inference of . . . retaliation can be drawn from these facts." (Pl. Brief at 28.) But, for the scattered inclusion of the word "retaliation," the undersigned would recommend that all such claims be considered abandoned. Out of caution, the Court will address them to the extent possible.

### a. *Prima Facie* Case

Section 1981 retaliation claims, like discrimination claims, are also governed by the *McDonnell Douglas* burden-shifting framework. The plaintiff again does not suggest he has any direct evidence to establish a claim of retaliation. A plaintiff may demonstrate *prima facie* retaliation by showing (1) engagement in a protected activity, (2) adverse action taken against the plaintiff, and (3) a causal connection between the protected activity and the asserted adverse action. *Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir.2008).

As stated, the plaintiff does not argue any protected activity or causal connection. He has included no section analyzing any retaliation claim. This makes the Court's job very difficult. It is, of course, the Court's institutional responsibility to interpret legal claims. The Court cannot suffer any existential harm in the consideration of poorly prosecuted ones. But, it is not the Court's obligation to make sense of a jumble of allegations. The plaintiff must connect a sensible presentation of evidence to the elements of a cognizable claim. Even still, the Court will consider the plaintiff's offering as far as it goes.

Here, the first two elements of a *prima facie* case of retaliation are considered satisfied. Again, the plaintiff has not bothered to organize or argue them, but, based on his Complaint and factual allegations, generally, it appears he means to complain that he suffered an adverse employment action in the (1) termination of his employment; (2)

17

suspension of his employment, on August 12, 2009; and (3) refusal to redeploy him. (Compl. ¶¶ 43-53; Pl. Brief at 21.)   The Court will discuss these incidents in some detail below.  Some or all of these incidents qualify as adverse employment actions.

Regarding the second element, the only possible protected activity is as follows.  On February 9, 2009, an incident occurred between the plaintiff and a co-worker, John Wilson (white). (Pl. Dep. at 104-105; 45-46.)  Wilson accused the plaintiff of moving a camera and then told the plaintiff not to touch the equipment because he was a "foreigner" and that "whoever brought you here needs to hurry up and get you out of here."  (Pl. Dep., Ex. 22; Pl. Dep at 105-06.)  There is no allegation that Wilson was the plaintiff's supervisor, a relevant decisionmaker in this case, or influential to any decisionmaker relevant here.

The plaintiff reported the incident to his supervisor, Josh Campbell, and Parson in Human Resources.   (Pl. Dep., Ex. 22; Pl. Dep. at 115, 117.)  The plaintiff's account was largely corroborated, although Wilson claimed, in the use of the word "foreigner," he was merely mimicking how the plaintiff referred to himself.  (Parson Stmt., Ex. 14.)  Wilson was made to apologize.   The plaintiff states that he did not want Wilson terminated and recommended sensitivity training instead.   (Pl. Brief at 8.)   Thereafter, the defendant established mandatory diversity training, (workplace) harassment training, and leadership by example training for the Staff Instructors. (Pl. Dep. at 116-117; Pl. Dep., Ex. 23.)

The plaintiff also describes an incident where he complained, in July 2009, about the use of alcohol and possession of a gun by other instructors at the training facility in Roxboro, NC.  (Pl. Brief at 30-31.)  This complaint cannot constitute any protected activity, however, because the plaintiff is not alleging to have complained about some activity made unlawful by Section 1981, to wit, discrimination or retaliation based on race or other protected class.  It was complaining about alcohol use and gun possession.

As to the third element, the Fourth Circuit has held, however, that "very little evidence of a causal connection is required to establish a prima facie case" and "merely the

18

closeness in time between the filing of a discrimination charge and an employer's firing an employee is sufficient" to satisfy the causation element of a prima facie retaliation case. *Tinsley v. First Union Nat. Bank*, 155 F.3d 435, 443 (4th Cir.1998); *see also Williams v. Cerberonics, Inc.*, 871 F.2d 452 (4th Cir.1989) (holding three month time period between protected activity and termination sufficient to satisfy the causation element of the prima facie case of retaliation); *Carter v. Ball*, 33 F.3d 450 (4th Cir. 1994) (finding causal link between filing of retaliation complaints and the plaintiff's demotion five months later).

The plaintiff's employment, however, was terminated, on or about November 17, 2009, nine months after his complaint concerning John Wilson. On its own, this is probably too long of a passage of time even for the *prima facie* case causal element. *See Booth v. Maryland*, 337 F. App'x. 301 (4th Cir. July 21, 2009) ("Booth's demotion occurred approximately nine months after his initial lawsuit leading to the settlement agreement. The temporal proximity, thus, is too remote to prove the causal connection alone.")

The plaintiff's suspension, in July 2009, however, was only five months removed from the complaint and, therefore, more probative of causation. *See Carter*, 33 F.3d 450.

The alleged refusal to redeploy the plaintiff was even more proximate to the complaint, such alleged refusal having started roughly in late April 2009. (Pl. Dep. at 162, 176; Pl. Dep., Ex. 22.)

The Court would consider the *prima facie* case provisionally established.

**b.     Legitimate, Non-discriminatory Reason and Pretext**

For each alleged adverse employment action, the Court would consider the defendant's proffered explanation and the plaintiff's evidence of pretext, if any.

**1.     Termination**

As stated, the defendant contends that the termination of the plaintiff's employment was the result of an RIF, which is a legitimate, non-discriminatory reason for termination. *See Mereish*, 359 F.3d at 335. The plaintiff does not make any argument concerning the

19

truthfulness of the RIF, as far as the Court can tell.  He certainly has not offered any probative evidence that the RIF was not the real reason for his termination.

### 2.    Suspension

In August 2009, the plaintiff had a confrontation with co-workers while he was instructing a class in Roxboro, NC. (Pl. Dep. at 197.)  Robert Grove (white) and Laquetta Paylor (African-American), Staff Instructors, who were in the same area as the plaintiff's class, spoke with a sergeant while the plaintiff was teaching. (Pl. Dep. at 187.) The plaintiff stopped class and asked that Grove and Paylor leave his classroom. (Pl. Dep. at 187.) The plaintiff complained to Garcia about the incident. (Parson Stmt., Ex. 21.)  Human Resources placed the plaintiff on suspension, on August 12, 2009, while it investigated. (Pl. Dep., Ex. 31.) As a result of the investigation, Human Resources decided to move the plaintiff to Ladson, South Carolina, given his deteriorating relationship with the peers and supervisors. (Pl. Dep. at 200.)

Again, the plaintiff has not made any mention concerning evidence of pretext or falsity as to the reason for the suspension.  The rationale, which is legitimate and non-discriminatory, remains unrebutted.

### 3.    Refusal to Redeploy

Although a fairly tedious and, frankly, attenuated account, the only set of circumstances in this case, which give the Court genuine pause, are those allegations surrounding the plaintiff's initial deployment, return, and subsequent refusal to redeploy. The story is essentially as follows.

After being promoted to the Staff Instructor II position, the plaintiff was deployed to Iraq, on March 4, 2009.  The plaintiff taught two classes. (Pl. Aff. ¶ 24.)  Within less than a months time, the plaintiff, however, was asked if he wanted to be reassigned to Taji, Iraq because there was a need for additional instructors to support the US Army MRAP Training

program. The plaintiff was advised that it was urgent to proceed to Taji without any delay. On March 29, 2008, Fahnbulleh deployed to Taji. (PI Aff. ¶ 24).

But, in Taji, the plaintif was allegedly informed that there were not Staff Instructors at Taji, and that he has seen a few MRAP vehicles operated by a limited military unit at Taji. (Pl. Aff. ¶ 27.)  In other words, there did not exist the need in Taji that had been implied.

Within a couple of days, the plaintiff was assigned living quarters with a Martin Rose. As it turned out, Rose had an admittedly severe sleeping and snoring disorder that required the use of a CPAC machine.  (Pl. Aff. ¶ 32.)  The plaintiff had great difficulty sleeping, as a result, and complained bout it to supervisors.  Apparently, however, contractors are normally not permitted to deploy with a CPAC machine.  Even still, the plaintiff and Rose attempted to make a machine operative so that they could continue with the living arrangements.  *Id.*

On the evening of April 5, 2009, the plaintiff was unexpectedly informed that there was an urgent, short-term need for an Instructor in Camp Liberty and that he should go immediately.  *Id.* ¶ 37.  But, upon arrival at Camp Liberty no personnel were waiting for him as apparently no one knew he was coming.  *Id.* ¶ 38.  After nearly four hours of waiting, he was finally picked up. *Id.* ¶ 39.  When the plaintiff informed the individuals who picked him up that he was there as an additional Instructor, the plaintiff was allegedly told, ""Masu, we have more than enough Instructors here, something isn't right."  *Id.* ¶ 39.  Personnel at Camp Liberty continued to seek clarification from Taji about the plaintiff's role and again indicated to the plaintiff that "something here don't make sense."  *Id.* ¶ 40.

Later that day, the plaintiff was informed that a 4 pm conference call was scheduled between Doug Hitchens, Theater Operations Manager for the defendant, Leonard Reynolds, and him.  *Id.* ¶ 42.  During the call Hitchens informed the plaintiff that he was to return immediately to Ladson, SC and to report to Alfred Daniels (Director Training/ILS) and Joshua Campbell (Training Manager/ILS).  *Id.* He was to leave on April 9.  *Id.* The plaintiff asked Hitchens why was he returning so abruptly.  *Id.* Hitchens responded, "You said

something derogatory about the DOD Site Lead- Laura Lomgaker- at Taji and you must leave Theater (Iraq) immediately." *Id.*

Upon arrival in Charleston, SC, Parson told the plaintiff that he had been accused of sexual harassment against Longaker and assault on another employee. Specifically, Rose had told Longaker that the plaintiff had made sexually inappropriate remarks about her. The plaintiff immediately denied the allegations, stating that his transfer related to the living arrangement issues with Rose and a rigorous "bear hug" the plaintiff had given to co-worker and friend. *Id.* ¶ 50. The plaintiff was put on administrative leave.

An investigation was made. But, Longaker refused to provide a statement and would not allow access to two potential witnesses who were contractors with another company. (Pl. Dep., Ex. 27; Parson Stmt. ¶ 34.) As there were no available witnesses other than the plaintiff and Rose, Parson closed the investigation as unfounded. (Pl. Dep., Ex. 22.)

On several occasions the plaintiff inquired into his status for re-deployment to Iraq. Although the defendant had closed its investigation of the plaintiff's alleged sexual comments in Iraq, the Department of Defense had not concluded its own investigation. (Pl. Dep., Ex. 28; Pl. Dep. at 159-160; 167.) Parson learned that the government would not agree to allow the plaintiff to return to Iraq. (Parson Stmt. Ex. 18.) Despite additional efforts by the defendant to have the Department of Defense review its decision, the government decided in September 2009 that the plaintiff could not return to Iraq due to the "possibility that his presence will create a situation that the government would like to avoid. While no guilt has been directly discovered by the defendant, the feelings of many personnel, both government and contractor, are that the situation could erupt if he was allowed to return to the program because of these allegations." (Pl. Dep. Ex. 307; Parson St. Ex. 23.)

Frankly, the Court does not know what to make of the account. The parties do not

disagree much as to its detail. The first impediment to the plaintiff's claim of retaliation for failing to redeploy him is the unrebutted evidence that the Department of Defense would not allow it. (Pl. Dep., Ex. 28.) The plaintiff has not produced any evidence as to the falsity of this non-discriminatory explanation for not redeploying him.

In its most technical articulation, therefore, the claim cannot survive. But, viewed more broadly the totality of the event raises some possible basis for a claim. First, after a good amount of effort in securing a Staff Instructor II position and associated deployment, the plaintiff was shortly transferred, not once, but twice, in Iraq. Both transfers were under the auspices of instructor need but upon arrival at each location his (1) arrival was unexpected and (2) no need actually existed. The plaintiff was then accused of harassment and assault and rather abruptly and mysteriously rushed back to South Carolina. So, in essentially one months time, the deployment he was originally denied but then eventually granted was again reneged, only after a largely unexplained Rube Goldberg of events.

The question for summary judgment, therefore, is whether the unresolved explanations for the plaintiff's treatment in Iraq are sufficient evidence of "falsity" to allow a jury to disregard the defendant's more clinical account of the events and infer discrimination. *See Reeves*, 530 U.S. at 142-43. The Court would say no. The numerous events, at issue, involved disparate people, with limited relation, and there is no evidence that they were working in concert. As the plaintiff separately alleges, one would have to accept the presence of a fairly involved conspiracy to believe that the events which befell him were the result of intentional retaliation. He has not built that sort of record. At best, he has suggested that Rose and Josh Campbell, an Instructor II supervisor, were friends. (Pl. Dep. at 151.) And, the plaintiff claims that he was later told that "his return was at the insistence of Josh Campbell." (Pl. Brief at 23.) But, such evidence would only be effective to show some coordination between those two individuals and only about the living situation with Rose, at best. Rose and Campbell's alleged relationship casts very little light on the

possibility that a conspiracy existed to retaliate against the plaintiff for complaining about Wilson. In fact, such evidence makes it more likely that if any nefarious motives were at play, Rose's personal difficulties with the plaintiff were at the source rather than some retaliatory animus.

The undersigned could not recommend it, but if this case has any opportunity going forward it is somewhere in the puzzle of these particular allegations related to the plaintiff's deployment and return and not with respect to any failure to redeploy.

### c.    Conspiracy to Discriminate

For essentially the same reasons, any conspiracy claim must fail. First, no such claim is cognizable under 42 U.S.C. § 1981, as pled. Such a claim is only available pursuant to 42 U.S.C. § 1985. More fundamentally, the plaintiff, as just described, has not put forward any evidence of it. The only actual evidence of record, apart from what the plaintiff would surmise, shows that Alfred Daniels (African-American), the Director of Field Services, required that the plaintiff return to the United States for the investigation. (Pl. Dep. Ex. 29.) As discussed, the plaintiff's evidence regarding Campbell and Rose, besides being of the self-serving variety, does nothing to tie any collusive conduct to a discriminatory or retaliatory motive. Instead, the plaintiff's evidence only tends to suggest that Rose wanted the plaintiff gone for personal reasons. The plaintiff's evidence betrays his own conclusion about it.

### III.    Hostile Work Environment Claim

Lastly, the defendant has moved for dismissal of the plaintiff's hostile work environment claim. To establish a hostile work environment claim, the plaintiff must prove by a preponderance of the evidence that he was subjected to (1) unwelcome harassment; (2) based on his race; (3) that is sufficiently severe or pervasive to alter the conditions of his employment and create an abusive atmosphere; and (4) that is imputable to the defendant. *See EEOC v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 175 (4th Cir.2009).

The plaintiff alleges that the following incidents, taken together, amount to a hostile work environment:

1.    John Wilson's "foreigner" comment;

2.    The accusation that he had made sexually harassing statements and the resulting treatment of the plaintiff while under suspiscion for it; and

3.    His treatment after returning to the United States, while stationed in Roxboro, NC.

(Pl. Brief at 29-31.)

The Court would describe briefly the plaintiff's time in Roxboro. On May 17, 2009, the plaintiff and other Staff Instructors were relocated to Roxboro, North Carolina. (Pl. Aff. ¶ 54.) While there, the plaintiff was eventually taken off the training schedule by Matt Garcia (Hispanic), the Senior Instructor responsible for the training schedule. *Id.* ¶ 56. When the plaintiff inquired why he was not included on the Training Schedule, Garcia responded that some Instructors said that they did not want the plaintiff in class with them. *Id.*

Also, and as previously mentioned, the plaintiff complained to Paul Kovarovik, the Vice President of Integrated Logistics Support, that several other Staff Instructors were reporting to work drunk and that guns had been pulled on two trainees. (Pl. Dep. at 185-87.)

Then on August 12, 2009, the plaintiff contends that a Robert 'Bob' Grove and a Laquetta Paylor interrupted his class and for well over 10 minutes interfered with one of the students. *Id.* ¶ 69. For the resulting confrontation between the plaintiff and the two individuals, the plaintiff was suspended as earlier discussed. (Pl. Dep., Ex. 31.)

### A.    Based on Race

The plaintiff's evidence fails the second element of the claim that any alleged harassing conduct be on account of his race. *See  Cent. Wholesalers, Inc.*, 573 F.3d at

175. The allegations contain exactly one incident of *racially* related conduct. The claim is not established by recitation of a long list of "bad" things. A litany of workplace mistreatment is just that. Other than the Wilson comment, the plaintiff has no evidence that any of the other conduct was on account of his race.

Courts have repeatedly held that such job-duty-related disparities and grievances are not of the kind the claim contemplates. *See Fleming v. MaxMara USA, Inc.*, 371 Fed. App'x 115, 119 (2d Cir. 2010) (finding that excluding employee from meetings and criticizing employee's work did not support hostile work environment claim); *Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir.2002) (finding that supervisor's "rude, abrupt, and arrogant" behavior and "stern and severe criticism" did not support employee's hostile work environment claim); *Cole v. Hillside Family of Agencies, Inc.*, 2011 WL 2413928, at *7 (D. Md. June 9, 2011) (finding that being forced to work without pay, being forced to redo assignments, being denied professional development opportunities, unjustifiably removing job duties, and isolating from co-workers is not sufficiently severe and pervasive for a hostile work environment claim)*; Myers v. Md. Auto. Ins. Fund*, 2010 WL 3120070, at *6 (D. Md. Aug.9, 2010) (finding that allegations of employer micro-managing, harassing, and belittling employee was unwelcome but not severe and pervasive).

## B.    Severe or pervasive

Certainly, a single incident can be sufficiently severe to create a hostile work environment. *See Okoli v. City of Baltimore*, 648 F.3d 216, 220 n.5 (4th Cir.2011). But, Wilson's comment does not qualify.

The "severe or pervasive" element of a hostile work environment claim "has both subjective and objective components." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333 (4th Cir. 2003) (en banc). First, the plaintiff must show that she "subjectively perceive[d] the environment to be abusive." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993). Next, the plaintiff must demonstrate that the conduct was such that "a reasonable person

26

in the plaintiff's position" would have found the environment objectively hostile or abusive. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82 (1998).

Issues of fact exist as to the plaintiff's subjective impression. Truthfully, the plaintiff has not made much of the comment; indeed, to his credit, he did not want Wilson fired. (See Pl. Dep. at 74.)  The Court would be hesitant, though, to conclude that a reasonable jury could not find, based on this evidence, that the plaintiff subjectively perceived the defendant's conduct as severe or pervasive. *See, e.g., Spriggs*, 242 F.3d at 185-86 (finding a victim's complaints to supervisors about harassment shows he believed the environment was hostile or abusive).

As to the objective severity of the harassment, however, it "should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances,'" giving "careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Oncale*, 523 U.S. at 81; *see also Harris*, 510 U.S. at 23 (warning whether a hostile environment actually existed "can be determined only by looking at all the circumstances").  "There is no mathematically precise test" for determining when a hostile or abusive work environment exists. *Harris*, 510 U.S. at 22. The circumstances that should be considered include: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with an employee's work performance. *Harris*, 510 U.S. at 23; *see also EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008).  But, "'no single factor is' dispositive." *Sunbelt*, 521 F.3d at 315 (quoting *Harris*, 510 U.S. at 23).

In order to be actionable, the harassing "conduct must be [so] extreme [as] to amount to a change in the terms and conditions of employment." *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).   The Fourth Circuit has "recognized that plaintiffs must clear a high bar in order to satisfy the severe or pervasive test." *Id.*  It has stated,

therefore, that the "task then on summary judgment is to identify situations that a reasonable jury might find . . . instances where the environment was pervaded with discriminatory conduct 'aimed to humiliate, ridicule, or intimidate,' thereby creating an abusive atmosphere." *Id.* (quoting *Jennings v. Univ. of North Carolina*, 482 F.3d 686, 695 (4th Cir. 2007). "[W]hether harassment was sufficiently severe or pervasive to create a hostile work environment is 'quintessentially a question of fact' for the jury." *Conner v. Schrader-Bridgeport Int'l, Inc.*, 227 F.3d 179, 199-200 (4th Cir. 2000) (quoting *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 243 (4th Cir. 2000)).

The Wilson incident fails the extremity test. The Court disagrees that a jury should be allowed to conclude that the single occasion of Wilson having called the plaintiff a "foreigner," who should be deported as soon as possible, was sufficiently humiliating and outrageous to clear the "high bar" set by the Fourth Circuit. *See, e.g., Skipper v. Giant Food Inc.,* 68 F. App'x. 393, 398 (4th Cir.2003) (finding manager who harassed plaintiff by following him around and referring to him by a racial slur on one occasion, coupled with daily exposure to racist graffiti and the Plaintiff overhearing other employees use the same slur thirteen times in a four year period insufficient); *Roberts v. Fairfax Cnty. Pub. Schs.*, 2012 WL 380130, at *5 (E.D. Va. Feb. 6, 2012) (holding that even the use of the term "nigger" two times by the plaintiffs supervisor was "insufficient to permeate [the plaintiff]'s work environment with discriminatory intimidation, ridicule, and insult.").

The claim should be dismissed.

## CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, the Court recommends that the defendant's motion for summary judgment [Doc. 22] be GRANTED and all of the plaintiff's claims dismissed *with prejudice*.

IT IS SO RECOMMENDED.

s/Bruce H.  Hendricks
United States Magistrate Judge

July 31, 2013
Charleston, South Carolina

### Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.** "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

**Robin L. Blume, Clerk**
**United States District Court**
**Post Office Box 835**
**Charleston, South Carolina 29402**

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).